UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MICHAEL SMALLS,

                    Petitioner,

        -vs-

MARK BRADT


                    Respondent.

_____

**DECISION AND ORDER**

**No. 11-CV-0915**(MAT)

## I.    Introduction

*Pro se* Petitioner Michael Smalls ("Petitioner") has filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a judgment entered April 25, 2008, in New York State, County Court, Erie County, convicting him, upon a jury verdict, of First Degree Assault (N.Y. Penal Law ("Penal Law") § 120.10[2]) and Endangering the Welfare of a Child (Penal Law § 260.10[1]).

## II.   Factual Background and Procedural History

### A.    Indictment and Pre-Trial

Erie County Indictment No. 02916-2006 charged Petitioner with one count of First Degree Assault (Penal Law § 120.10[2]), two counts of Endangering the Welfare of a Child (Penal Law § 260.10[1]), First Degree Criminal Contempt (Penal Law § 215.51[b][v]), and Fourth Degree Tampering with a Witness (Penal

Law § 215.10[a]).  Prior to trial, the People voluntarily moved to dismiss counts three (second count of Endangering the Welfare of a Child) and four (Criminal Contempt in the First Degree) of the indictment.  See Ind. No. 02916-2006, dated 01/12/2007 at Resp't Ex. A;  Trial Trans. [T.T] 16.

A Huntley hearing was held prior to trial, at the close of which the trial court denied Petitioner's motion to suppress the statements he made to police.  Hr'g Mins. of 05/04/2007.  Also prior to trial, the trial court held a combined Sandoval/Ventimiglia hearing.  The trial court determined that the prosecution would be permitted to cross-examine Petitioner, if he testified, with regard to two prior convictions, and that the prosecution would be permitted to introduce evidence of his prior bad acts.  T.T. 8, 10.

**B.   Trial & Sentencing**

In November 2006, Dalisha Williams ("Williams" or "the victim") was living with her three young children, one of whom -- Martez Smalls ("Martez") -- was fathered by Petitioner.  At this time, Petitioner and Williams were not in a relationship, but occasionally saw each other.  T.T. 365, 374.

That fall, Williams' daughter, who was then a second-grade student, participated in a school fund raiser by selling candy. Williams had purchased $28 worth of candy from her, and Petitioner ordered $36 worth of candy.  Petitioner did not send the money to

the school.  Instead, he intended to submit the money to Williams, who would transfer the money to the school to cover Petitioner's order.  Between October and November 2006, Williams had discussed with Petitioner about seven times over the phone his responsibility to reimburse her $36 for the candy.  While Williams' cousin was at Williams' home on November 20, 2006, Williams called Petitioner on her cousin's phone and asked Petitioner for the $36.  Williams also informed Petitioner at that time that her son's foot had become stuck in the handle of a toy sword.  After the telephone conversation between Petitioner and Williams ended, Williams' cousin left.  T.T. 377-381.  Shortly thereafter, Petitioner drove to Williams' house, went to the back door, and knocked.  Williams opened the door halfway, but did not invite Petitioner inside. Petitioner pushed by Williams and entered her kitchen.  Petitioner and Williams then walked into the living room together.  T.T. 382-384.

Williams asked Petitioner for the money he owed her for the candy.  Petitioner, who was smiling, began touching and kissing Williams.  Williams did not want to have sex with Petitioner, and only wanted the money he owed her.  Again, Williams asked Petitioner for the money and, in response, he smirked.  Williams continued to ask Petitioner for the money, and they began to argue. Williams wanted Petitioner to pay her and leave, and she told him to "stop playing."  T.T. 385-387.  The verbal confrontation

escalated into a physical altercation.  Williams pushed Petitioner and then hit him.  Petitioner struck Williams in the jaw with his fist.  In response, Williams hit Petitioner back and then picked up a lamp and threatened to strike his head with it if he put his hands on her again.  T.T. 387-388, 465.

Williams put the lamp down, and she and Petitioner stood face to face.  Petitioner moved in and grabbed Williams' top lip with his teeth.  Williams grabbed Petitioner's lower lip with her teeth.  Petitioner then bit down hard on her lip and held it in his teeth.  Williams let Petitioner's lip go, and she tried to pry Petitioner's mouth open for about five minutes.  Petitioner eventually dragged Williams, by her lip, from the dining room area to the kitchen.  He released her only after unlocking the kitchen door.  Martez, who had been in the kitchen the entire time, was screaming.  Finally, Petitioner let Williams go, opened the door, walked out on the driveway, smirked, and then swallowed.  T.T. 388-394.  Williams was bleeding from her lip area, and there was blood all over her clothes.  T.T. 393.

Petitioner began running down the street, and Williams gave chase.  Williams picked up a brick and threw it at Petitioner.  The brick missed him and struck and shattered the sunroof of his car.  Petitioner said to Williams, "Bitch, you going to jail," and then called the police.  Martez continued to scream from inside the

house, and Williams returned to the house to calm him down.  T.T. 394-398.

Buffalo Police Officer Tara O'Neill ("O'Neill") responded to Petitioner's call.  When she arrived, Officer O'Neill saw Petitioner waving to her.  The sunroof of Petitioner's green Ford Taurus had been smashed, and there was glass on and around the car. O'Neill observed a small amount of blood on Petitioner's clothes. According to Officer O'Neill, Petitioner was irate and pointed down the street, saying, "look what the bitch did to my car."  Officer O'Neill got out of her car and saw Williams about ten houses down the street.  Petitioner got into Officer O'Neill's patrol car with Officer O'Neill and they drove down the street to Williams. T.T. 275-278.

According to Officer O'Neill, Williams was covered in "a ton of blood."  T.T. 278.  She observed that a piece the size of her thumbnail -- "a huge chunk" -- was missing from Williams' upper lip.  Officer O'Neill testified that the sight of the damage to Williams' face "kind of took [her] breath away."  BPD Officer Cedric Littlejohn, who had arrived at the scene shortly after Officer O'Neill, cursed out loud when he saw Williams' face. T.T. 278-279.  Williams went inside her house, and Officer O'Neill then heard "a blood-curdling scream" from inside, presumably because Williams had not "seen her face, she hadn't looked, and she obviously had at that point."  T.T. 279.  At that point, an

ambulance was called.  T.T. 279-280.  Officer O'Neill spoke with Williams, who told her that Petitioner had "grabbed her lip and drug her through a room to . . . a door, and then when he left the door, he actually took her lip and bit it right off."  T.T. 279-280.

Paramedics, the fire department, and additional officers eventually arrived at the scene as well.  Officer O'Neill asked Petitioner what had happened and asked him what he had done with the portion of Williams' lip that he had bitten off.  The police, several firemen, and two of the paramedics began searching for Williams' lip.  After searching both the interior and outside of the house for approximately ten minutes, they found nothing. T.T. 280-284.

Officer O'Neill told Petitioner that he would need to come to with her to the station house.  She then handcuffed Petitioner, placed him inside the patrol car, and drove him to the station house.  Upon their arrival there, Officer O'Neill spoke with Lieutenant Mark Michalek and provided him with a summary of the events.  Lieutenant Michalek told Petitioner that, due to the seriousness of Williams' injuries, he would be placed under arrest. Petitioner was then read his <u>Miranda</u> rights. T.T. 288. Petitioner stated that he understood his rights and then explained to Lieutenant Michalek what happened, stating that he had "bit[ten] [Williams'] lip and [he] felt it in [his] mouth."  T.T. 290.

Lieutenant Michalek asked Petitioner if he swallowed the piece of Williams' lip, to which he responded that he had spit out and then ran to his car.  T.T. 286-291.

EMT Timothy Perrott ("Perrott"), who arrived at the scene of the crime at approximately 3:40 p.m., testified that he attempted to treat Williams, who was "hysterical," and that she had blood on her face and clothes.  He testified that a large section of tissue was missing from Williams' upper lip.  Perrott dressed the wound with gauze to stop the bleeding.  He testified that, in his eight years of experience as an EMT, he had not seen a person with a piece of his/her face missing as a result of a bite.  T.T. 353-361.

Nurse practitioner Jaqueline Collard ("Collard"), who was working in the forensic medical unit at the Family Justice Center in downtown Buffalo and documented injuries sustained by victims treated there, testified that, during her tenure, she had seen over 230 people.  She testified that, although she saw quite a few bite marks, she had never seen one as severe as the Williams had suffered.  T.T. 476-481.

Registered nurse James P. Vollmer ("Vollmer"), who was working in the emergency room at ECMC and treated Williams on the day of the incident, testified that "[t]his was the first time [he] [had] seen an upper lip bitten avulsion."  T.T. 483.  Vollmer testified that Williams returned to the ECMC emergency room on December 4 for a follow-up visit and that "she had increased pain, numbness and

swelling." T.T. 487. He testified that there was a possibility that Williams' injury could result in numbness. T.T. 488.

Williams underwent surgery at the Erie County Medical Center ("ECMC") to repair the area of avulsed skin measuring approximately two and one-half centimeters long, one and one-half centimeters high, and three to four millimeters deep. Due to the severity of the injury and the amount of plastic surgery needed to repair the lip, a specialist was called in to perform the surgery. The specialist used tissue from inside Williams' mouth and the underside of her lip to repair the damage from the bite. Amanda Chauncey ("Chauncey"), a physician assistant at ECMC who treated Williams on the day of the incident, testified that the sensation in Williams' top lip will likely not return, and the lip will never look the same. T.T. 490-502.

At the close of the trial, Petitioner was found guilty of First Degree Assault and Endangering the Welfare of a Child, and was acquitted of Fourth Degree Tampering with a Witness. T.T. 623.

### C.   Petitioner's CPL § 330.30 Motion & Sentencing

Subsequently, Petitioner moved, pursuant to N.Y. Crim. Proc. Law (CPL) § 330.30, to set aside the verdict based on the alleged recantation of the victim. Oral argument was heard on the motion on February 13, 2008, and the trial court, in a written decision dated March 26, 2008 denied the motion. See Mem. and Order of the

Erie County Court (Michael Pietruszka, J.C.C.), dated 04/26/2008 at Resp't Ex. A.

On April 25, 2008, Petitioner was sentenced, as a second violent felony offender, to a determinate fifteen year term of imprisonment for the assault conviction with a five-year period of post-release supervision, and a definite one year term of imprisonment for the endangering conviction. Sentencing Mins. 6-7.

**D.   The Direct Appeal**

Through counsel, Petitioner appealed his judgment of conviction on the following grounds: (1) ineffective assistance of counsel based on counsel's failure to object to the prosecution's medical witnesses and adequately cross-examine them; (2) the trial court erred when it permitted the prosecution to adduce prior bad act evidence; (3) the trial court should have granted a mistrial after statements made by Petitioner were admitted in evidence but not included in the People's CPL § 710.30 Notice; (4) he was deprived of his right to a fair trial when the trial court admitted photographs of the victim's injury; (5) the evidence was legally insufficient to support the assault in the first degree conviction or the verdict was against the weight of the evidence;  (6) the trial court should have granted a further hearing on Petitioner's CPL § 330.30 motion; (7) he was denied his right to be present at material stages of the proceedings; and (8) his sentence was harsh and excessive.  See Pet'r Br. on Appeal, Points I-VIII at Resp't

Ex. B.   The Appellate Division, Fourth Department unanimously affirmed the judgment of conviction, and leave to appeal was denied.  <u>People v. Smalls</u>, 70 A.D.3d 1328 (4th Dep't 2010); <u>lv. denied</u>, 14 N.Y.3d 844 (2010).  The New York Court of Appeals denied Petitioner's request for reconsideration on July 29, 2010.  <u>Smalls</u>, 15 N.Y.3d 778 (2010).

    **E.   The Habeas Corpus Petition**

This habeas corpus petition followed, wherein Petitioner seeks relief on the following grounds: (1) the evidence was legally insufficient to support Petitioner's conviction for assault in the first degree; (2) he was denied his right to a fair trial when the trial court admitted evidence of Petitioner's prior bad acts; (3) he was denied his right to a fair trial when the trial court admitted photographs of the victim's injuries; (4) ineffective assistance of counsel based on counsel's failure to properly investigate and prepare for trial; and (5) the trial court erroneously denied his post-trial CPL § 330.30 motion without conducting an evidentiary hearing.  <u>See</u> Pet. ¶ 22A-E (Dkt. No. 1); <u>see also</u> Reply, Points I-V (Dkt. No. 13).

For the reasons that follow, habeas relief is denied and the petition is dismissed.

**III. The Exhaustion Requirement**

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted

the remedies available in the courts of the State. . . ."  28 U.S.C. § 2254(b)(1)(A);  see, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 843-44 (1999);  accord, e.g., Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994), cert. denied, 514 U.S. 1054 (1995).  "The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." Daye v. Attorney General, 696 F.2d 186, 191 (2d Cir. 1982) (en banc), cert. denied, 464 U.S. 1048 (1984).

## IV.  The AEDPA Standard of Review

For federal constitutional claims adjudicated on the merits by a state court, the deferential standard of review codified in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies. A habeas petitioner can only obtain habeas corpus relief by showing that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).

## V.  Analysis of the Petition

## 1.  The Evidence was Legally Sufficient to Support Petitioner's Conviction for First-Degree Assault

Petitioner argues, as he did on direct appeal, that the evidence was legally insufficient to support his first-degree assault conviction because "the element of serious and permanent

disfigurement was not established." Pet. ¶ 22A. In his Reply, he contends that "[a]t trial[,] the [P]eople presented no evidence regarding the severity of the victim's injury other than photographs and observations made immediately after the incident by non-experts and unqualified witnesses." Reply at Point III. This claim is meritless.[1]

"[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he [or she] is charged." Jackson v. Virginia, 443 U.S. 307, 315 (1979) (internal quotation marks and citation omitted). On habeas review of a claim of legally insufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (citation omitted). A petitioner "bears a very heavy burden in convincing a federal habeas court to grant a petition on the grounds of insufficiency of the evidence." Fama v. Comm'r of Corr. Servs.,

---

[1]
    At the outset, the Court notes that, although Respondent has not argued so in its opposing papers, this claim appears to be subject to procedural default. In rejecting this claim, the Appellate Division found that the claim had not been properly preserved for appellate review "inasmuch as [Petitioner] did not renew his motion for a trial order of dismissal after presenting evidence." Smalls, 70 A.D.3d at 1330 (citation omitted). In the alternative, the Appellate Division determined that the claim was meritless. Id. Despite the Appellate Division's rejection of this claim on a state procedural rule, both parties have substantively argued the merits of this claim. Because the parties have done so and insofar as the Appellate Division rejected the claim, in an alternative holding on the merits, this Court reviews the claim on the merits under the deferential AEDPA standard.

235 F.3d 804, 811 (2d Cir. 2000) (citation omitted). Moreover, "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal; we defer to the jury's assessments of both of these issues." Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996) (citations omitted); see also Jackson v. Heath, No. 10 Civ. 3449, 2010 U.S. Dist. LEXIS 79618, 2010 WL 3075557, at *14 (S.D.N.Y. Aug. 6, 2010) ("The law is well established that questions of witness credibility are jury questions and a federal habeas court may not reassess the jury's finding of credibility: federal habeas courts are not free to reassess the fact specific credibility judgments by juries or to weigh conflicting testimony. On collateral review this Court must presume that the jury resolved any questions of credibility in favor of the prosecution.") (internal quotation marks, alteration, and citations omitted).

"When it considers the sufficiency of the evidence of a state conviction, '[a] federal court must look to state law to determine the elements of the crime.'" Fama, 235 F.3d at 811 (quoting Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir.1999)); see also Jackson, 443 U.S. at 324 n.16 ("the standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law"). Pursuant to N.Y. Penal Law § 120.10[2], "A person is guilty of assault in the first degree when: . . . [w]ith intent to disfigure another person seriously and permanently, . . . he [or she] causes such injury to such person

. . . " Viewing the evidence in the light most favorable to the prosecution, a rational jury could have found beyond a reasonable doubt that Petitioner seriously and permanently disfigured Williams when he bit off a portion of her upper lip.

In this case, ECMC P.A. Chauncey, who attended to Williams' when she first arrived at the hospital and observed the reconstructive surgery performed on Williams' lip, testified that she remembered treating Williams "[b]ecause of the severity of her injury, her bite wound." T.T. 494. Chauncey testified that over the past six years working as a P.A., she had never see an injury like Williams' before. She estimated that the avulsed skin on Williams' face was two millimeters in length, one and a half centimeters in height, and three to four millimeters in depth. T.T. 497. Chauncey testified that due to the severity of the injury and the amount of plastic surgery that needed to be done to repair the lip, a specialist was called in to perform the reconstructive surgery. The specialist created a new lip for Williams by taking skin from the inside of her mouth, "pull[ing] it up, and then sutur[ing] the inside of her lip up over the top." T.T. 499-500. Chauncey testified that, based on her experience and training, sensation would not be restored to Williams' top lip and numbness would remain. T.T. 501. When asked by the prosecutor if Williams' reconstructed lip would ever look the same as it did before the incident, Chauncey stated, "[a]bsolutely not. [Williams] would need massive reconstruction surgery and it still would not --

it will never look the same." T.T. 502. Chauncey also stated, in response to the prosecutor's question as to whether the injury was permanent, "[a]bsolutely." T.T. 502.

Williams testified that, after the incident, she was in "a lot" of pain and when asked by the prosecutor to rate said pain on a scale of one to ten (ten being the worst), she rated it a ten. T.T. 408. Williams testified that she suffered from that degree of pain "for weeks" after the incident and had to eat and drink out of a straw for about a month and a half. T.T. 408. She also testified that she was told by the doctors at the time of the injury that she would need additional reconstructive surgery in a year's time. T.T. 409. Additionally, Williams testified that for approximately one month after the incident, she wore hospital masks at home and outside to conceal her injury from her children and others. T.T. 404-407. At the time of the trial, which was approximately one year after the incident, Williams' lip was still numb and did not look as it did before the injury. T.T. 416.

In sum, viewed in the light most favorable to the State, the evidence was sufficient to permit a reasonable fact-finder to conclude beyond a reasonable doubt that Petitioner was guilty of first-degree assault. To the extent the state court adjudicated this claim on the merits, said adjudication was neither contrary to nor an unreasonable application of <u>Jackson v. Virginia</u>. Petitioner's insufficiency of the evidence claim is therefore meritless.

**2.    Petitioner was not Denied his Right to a Fair Trial when the Trial Court Admitted Evidence of Petitioner's Prior Bad Acts**

Petitioner argues, as he did on direct appeal,[2] that the trial court deprived him of a fundamentally fair trial when it admitted evidence of Petitioner's prior bad acts, namely his previous assaults of the victim which involved his biting her.  See Pet. ¶ 22B; Reply, Point I.  This claim is meritless and does not warrant habeas relief.

Under both federal and New York law, evidence of prior crimes may not be admitted solely to show that a defendant has a propensity for criminal activity.  See Fed. R. Evid. 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."); People v. Rojas, 97 N.Y.2d 32, 36 (2001) ("[A] criminal case should be tried on the facts and not on the basis of a defendant's propensity to commit the crime charged.").  On the other hand, both jurisdictions permit uncharged crimes evidence to be introduced when it is relevant to an issue other than criminal propensity. See Fed. R. Evid. 404(b)(2) ("This evidence may be admissible for

---

[2]    The Appellate Division denied this claim on the merits, finding as follow: "[w]e further conclude that County Court properly allowed the People to present evidence of defendant's prior assaults against the victim.  Unlike evidence of general criminal propensity, evidence that a particular victim was the focus of a defendant's aggression may be highly relevant.  Here, the prior incidents in which defendant bit the victim were relevant to establish the assaultive nature of their relationship and defendant's intent.  The court properly balanced the probative value of the evidence against its potential for prejudice and its instructions to the jury minimized any prejudicial effect." Smalls, 70 A.D.3d at 1330 (internal citations and quotations omitted).

another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."); <u>United States v. Gelzer</u>, 50 F.3d 1133, 1139 (2d Cir. 1995) ("Rule 404(b) does not bar all other crime evidence; it bars only the admission of a defendant's uncharged crimes to prove propensity to commit the crime charged.") (internal quotation marks omitted); <u>People v. Allweiss</u>, 48 N.Y.2d 40, 47 (1979) ("When evidence of uncharged crimes is relevant to some issue other than the defendant's criminal disposition, it is generally held to be admissible on the theory that the probative value will outweigh the potential prejudice to the accused."); <u>People v. Molineux</u>, 168 N.Y. 264, 293 (1901) (describing the so-called "MIMIC" exceptions to the proscription against the use of other crimes evidence).

Here, as the Appellate Division correctly found, the evidence concerning Petitioner's prior assaults against the victim (which involved him biting her) was not admitted to show his propensity to commit crime; rather, it was properly admitted because it established "the assaultive nature of [the relationship between Petitioner and Williams] and [Petitioner's] intent." <u>Smalls</u>, 70 A.D.3d at 1330 (citations and internal quotations omitted). Moreover, the trial court acted well within its discretion in implicitly finding that the probative value of that evidence outweighed its prejudicial effect, and appropriately minimized any

resulting prejudice through its limiting instruction to the jury. See id.

In any event, even if the evidence of Petitioner's prior bad acts against the victim was admitted for an arguably improper purpose, the Supreme Court has expressly declined to resolve whether the use of "prior crimes or bad acts" to show criminal propensity violates Due Process. See Estelle v. McGuire, 502 U.S. 62, 75 n.5 (1991). "Thus, since the Supreme Court has taken no position on the issue, it would be impossible for [a district court] to make the determination required under § 2254(d), namely that the state court decision violated 'clearly established Federal law as determined by the Supreme Court of the United States.'" Roberts v. Phillips, 03-CV-2957 (NGG), 2004 U.S. Dist. LEXIS 3432, 2004 WL 502920, at *3 (E.D.N.Y. Feb. 2, 2004); see Allaway v. McGinnis, 301 F. Supp. 2d 297, 300 (S.D.N.Y. 2004) ("[T]he Supreme Court has not yet clearly established when the admission of evidence of prior crimes under state evidentiary laws can constitute a federal due process violation.") (citing Estelle, 502 U.S. at 67-68).

Accordingly, Petitioner's claim relating to the admission of evidence concerning his prior bad acts does not warrant habeas relief and is consequently denied.

### 3.   Petitioner was not Deprived of a Fair Trial when the Trial Admitted Photographs of the Victim's Injuries

Petitioner claims, as he did on direct appeal,[3] that the trial court deprived him of a fundamentally fair trial when it improperly admitted in evidence photographs of the victim's injuries.   See Pet. ¶ 22C; Reply, Point II.   According to Petitioner, these "[p]hotograhs were not of [the] injury sustained, but of [the] injury induced by swelling, with stitching after surgery was performed."   Reply, Point II.   Petitioner claims that the photographs had no probative value and were improperly admitted solely for the purpose of "arous[ing] the passions of the jury" and "cause[d] undue prejudice toward [him]."   Id.   This claim is meritless.

A federal habeas court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."   Estelle, 502 U.S. 62, 68 (1991).   It is well-settled that "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus."   Taylor v. Curry,

---

[3]    The Appellate Division denied this claim on the merits, finding that: "[c]ontrary to defendant's contention, we conclude that the court properly admitted in evidence photographs of the victim's injury.   Photographs are admissible if they tend to prove or disprove a disputed or material issue and should be excluded only if their sole purpose is to arouse the emotions of the jury and to prejudice the defendant.   Here, the photographs were relevant to an element of assault in the first degree, i.e., serious and permanent disfigurement (Penal Law § 120.10 [2]), and thus it cannot be said that their sole purpose was to arouse the emotions of the jury and to prejudice the defendant."   Smalls, 70 A.D.3d at 1330 (internal citations and quotations omitted).

708 F.2d 886, 891 (2d Cir. 1983); see generally Estelle, 502 U.S. at 67 ("[H]abeas corpus relief does not lie for errors of state law." (citations omitted)).  Instead, for a habeas petitioner to prevail in connection with a claim regarding an evidentiary error, the petitioner must demonstrate that the error deprived him of his right to "a fundamentally fair trial."  Taylor, 708 F.2d at 891; see also Zarvela v. Artuz, 364 F.3d 415, 418 (2d Cir. 2004) ("Even erroneous evidentiary rulings warrant a writ of habeas corpus only where the petitioner 'can show that the error deprived [him] of a fundamentally fair trial.'" (quoting Rosario v. Kuhlman, 839 F.2d 918, 925 (2d Cir. 1988) (internal quotation marks omitted))).  In determining whether a state court's alleged evidentiary error deprived petitioner of a fair trial, federal habeas courts engage in a two-part analysis, examining (1) whether the trial court's evidentiary ruling was erroneous under state law, and (2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial.  See Wade v. Mantello, 333 F.3d 51, 59-60 & n.7 (2d Cir. 2003);  Ramos v. Phillips, No. 104-CV-1472-ENV, 2006 U.S. Dist. LEXIS 89699, 2006 WL 3681150, at *6 (E.D.N.Y. Dec. 12, 2006).

Under New York State law, the admission of the photograph in evidence was proper. In New York, demonstrative evidence is generally admissible if it tends "to prove or disprove a disputed or material issue, to illustrate or elucidate other relevant evidence, or to corroborate or disprove some other evidence offered

or to be offered." <u>People v. Pobliner</u>, 32 N.Y.2d 356 (1973). (citations omitted). In addition, "[p]hotographic evidence should be excluded only if its sole purpose is to arouse the emotions of the jury and to prejudice the defendant." <u>Id.</u>

In this case, the prosecution sought to introduce the photographs to illustrate the extent and seriousness of Williams' injuries -- in particular, that Petitioner had disfigured her. T.T. 242-245, 405-406. In order to prove Assault in the First Degree under Penal Law § 120.10[2],[4] the prosecution was obligated to establish that Petitioner "seriously and permanently" disfigured Williams when he bit a portion of her upper lip off. Thus, the purpose of admitting the photograph depicting the injury sustained to Williams' lip from the bite was not to inflame the passions of the jury; rather, it was probative of an element of assault in the first degree. <u>See, e.g.</u>, <u>Colon v. Conway</u>, No.06-cv-0139(MAT), 2010 U.S. Dist. LEXIS 1105, 2010 WL 114559 at *5(W.D.N.Y. Jan 7, 2010) ("When a photograph is otherwise relevant, the trial court has broad discretion in determining its admissibility. Here, it is clear that the photograph was relevant and admissible to prove grave risk of death to the child, a requisite element of the charge of first degree reckless endangerment."); <u>Carter v. Poole</u>, No. 9:04-cv-1386, 2008 U.S. Dist. LEXIS 58674, 2008 WL 2949385 at *18 ("Here, the photograph showing the condition and location of

---

[4]
   "A person is guilty of assault in the first degree when . . . [w]ith intent to disfigure another person seriously and permanently . . . he causes such injury to such person or to a third person." Penal Law § 120.10[2].

[the victim's decomposing body] was probative of an essential element in the case. Petitioner contended at trial, as he does in this proceeding, that the evidence of his guilt was insufficient because the forensic examiner could not determine a precise cause of death."); see also Bilbrew v. Garvin, No. 97-CV-1422 (JG), 2001 U.S. Dist. LEXIS 622, 2001 WL 91620, at *10 (E.D.N.Y. Jan. 10, 2001) (holding that trial court did not err in allowing victim to show scars on his neck and shoulder where serious physical injury was one of the elements of the offenses charged).

Moreover, even if the photographs were improperly admitted under state law, admission of the photographs did not deprive Petitioner of a fundamentally fair trial. "Where the prejudicial evidence is 'probative of [an] essential element' in the case, its admission does not violate the defendant's right to due process." Dunnigan, 137 F.3d at 125 (quoting Estelle, 502 U.S. at 69)). As discussed above, that was the case here. Furthermore, even if admission of the photographs was improper, it would not have been a constitutional violation unless it was "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." Id. (quoting Johnson v. Ross, 955 F.2d 178, 181 (2d Cir. 1992)). Here, apart from the display of the photographs of Williams' injuries, there was substantial evidence of her physical condition and of the circumstances of the assault -- all of which provided a basis for establishing Petitioner's guilt. Accordingly, the challenged

admission of evidence, even if erroneous, was not sufficiently material to constitute a due process violation.

Finally, the trial court took reasonable steps to minimize whatever prejudice there might have been from admission of the photographs.  Prior to showing the photographs to the jury, the trial court judge gave a cautionary instruction to the jury, stating, "[l]adies and gentlemen of the jury, you are about to view certain photographic exhibits.  You may find the photographs to be grim and/or unpleasant.  Please do not dwell on these photographs.  Please view them calmly and unemotionally and consider them for the purpose offered only.  Thank you."  T.T. 406.  The display of the victim's injuries, then, did not violate Petitioner's rights.  The state court's adjudication of this claim did not contravene or unreasonably apply clearly established federal law.  The claim is therefore denied.

### 4. Petitioner's Claim that the Trial Court Erred in Denying his CPL § 330.30 Motion without a Hearing is Not Cognizable

Petitioner asserts, as he did on direct appeal,[5] that the trial court erroneously denied his post-trial motion, pursuant to

---

[5]
The Appellate Division denied this claim on the merits, finding that: "[f]inally, we reject the contention of defendant that the court abused its discretion in denying his motion pursuant to CPL 330.30 without conducting a hearing. Defendant's motion was based solely upon the allegation that the victim recanted her trial testimony and admitted that she bit defendant before he bit her. It is well established that recantation evidence is inherently unreliable and insufficient alone to warrant setting aside the verdict.  In any event, the victim testified at trial that she was the initial aggressor, and it therefore "is not probable that defendant would receive a more favorable verdict at a retrial if the victim testified in accordance with her alleged statement to defense counsel recanting her trial testimony."  Smalls, 70 A.D.3d at 1331 (internal citations and quotations omitted).

CPL §330.30, to set aside the verdict without conducting a hearing. See Pet. ¶ 22E. This claim provides no basis for habeas relief.

A federal court can only grant a writ of habeas corpus where a petitioner is in state custody in violation of "the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254. The United States Constitution does not compel states to provide post-conviction proceedings for relief. Lackawanna Cnty. Dist. Attorney v. Coss, 532 U.S. 394, 402, 121 S. Ct. 1567, 149 L. Ed. 2d 608 (2001). The Court of Appeals for the Second Circuit recently held that, because federal law does not require states to provide a mechanism for post-conviction relief, "alleged errors in a post-conviction proceeding are not grounds for § 2254 review." Word v. Lord, 648 F.3d 129, 132 (2d Cir. 2011). Petitioner's claim that the trial court erred in denying his CPL § 330.30 motion without conducting a hearing does not implicate federal law and is not cognizable for habeas review. See id. ("[The petitioner's] claim of a procedural right to a state post-conviction proceeding does not implicate federal law."); Jones v. Duncan, 162 F. Supp. 2d 204, 217 (S.D.N.Y. 2001) (petitioner's claim that the trial court violated his due process right by denying his Section 330.30 and 440.10 motions without holding a hearing was not cognizable on habeas review).

Accordingly, this claim provides no basis for federal habeas relief and is denied.

## 5.   Petitioner Received Effective Assistance of Counsel

At ground four of the petition, Petitioner states, without citing any facts in support thereof, that he was deprived of the effective assistance of counsel because "trial counsel failed to properly investigate and prepare for trial."   Pet. ¶ 22D. Liberally construing Petitioner's *pro se* pleadings, he appears to be raising the same claim that he raised on direct appeal,[6] namely that counsel was ineffective because he failed to challenge the qualifications of the prosecution's medical witnesses.  See Pet'r Br. on Appeal, Point I; see also Reply, Point IV.   As discussed below, this claim is meritless.

A petitioner seeking a writ of habeas corpus on ineffective assistance of counsel grounds faces a heavy burden in establishing entitlement to relief.   Strickland v. Washington, 466 U.S. 668 (1984), established the two-prong test by which ineffective assistance of counsel claims are adjudicated.  See Harrington v. Richter, 131 S. Ct. 770, 780 (2011).   Under Strickland, a petitioner must demonstrate, first, that counsel's performance fell

---

[6]

The Appellate Division rejected this claim on the merits, finding that: "[w]e reject the contention of defendant that he was denied his right to effective assistance of counsel based on the failure of defense counsel to challenge the qualifications of the two medical witnesses.  Defense counsel's primary strategy was to establish that defendant did not intend to disfigure the victim and that his conduct was justified, and defense counsel pursued that strategy through, inter alia, vigorous cross-examination of the victim. Defendant thus failed to demonstrate the absence of strategic or other legitimate explanations for defense counsel's alleged shortcomings.  Moreover, defendant has failed to cite any authority to support his contention that only a plastic surgeon is qualified to testify concerning the seriousness and permanency of an allegedly disfiguring injury.   Viewing the evidence, the law and the circumstances of this case as a whole and as of the time of the representation, we conclude that defendant received meaningful representation."   Smalls, 70 A.D.3d at 1329 (internal citations and quotations omitted).

below "an objective standard of reasonableness" under "prevailing professional norms," Strickland, 466 U.S. at 688, and second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 698.  A court need not decide both prongs of the Strickland test if a there is an insufficient showing on one. See id. at 697.  In analyzing a claim that counsel's performance fell short of constitutional standards, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689.  In so doing, it must "affirmatively entertain the range of possible reasons [petitioner]'s counsel may have had for proceeding as they did." Cullen v. Pinholster, 131 S. Ct. 1388, 1407 (2011) (citation and internal quotation marks omitted).

Moreover, when ineffective assistance of counsel claims are presented on collateral habeas review, the court assesses them subject to the strictures of AEDPA and must be "doubly deferential" in reviewing the state court's determination that counsel acted effectively. Knowles v. Mirzayance, 556 U.S. 111 (2009) (citing Yarborough v. Gentry, 540 U.S. 1, 5-6 (2003) (per curiam)); see 28 U.S.C. § 2254(d).  In order to prevail on an ineffective assistance of counsel claim on habeas review, a petitioner must show not only that counsel's performance fell below the Strickland standard but also that the state court's adjudication of the Strickland standard was itself unreasonable.  See Harrington, 131 S. Ct. at 785. Stated differently, the court may afford habeas relief only upon a

finding that the state court was unreasonable — and not merely incorrect - in concluding that counsel's performance did not fall below an objective standard of reasonableness or, if it did, that petitioner was not prejudiced as a result. See id. Petitioner cannot meet this standard.

Initially, the record before this Court reflects that before the prosecution presented testimony from any of its medical witnesses, the jury heard grim and explicit testimony from the victim and the police officers who responded to the scene of the crime with respect to the conditions of the assault and the severity of the injury suffered by Williams. The ensuing presentation of medical testimony from the prosecution continued to paint a grimmer picture yet –- testimony that established the seriousness of Williams' injury, its grotesque appearance, and Williams' need for immediate reconstructive surgery. In light of this testimony as well as the reality of what Petitioner had done to Williams, counsel reasonably adopted a trial strategy in which he did not dispute the severity of Williams' injuries. Rather, he reasonably attempted to persuade the jury that, regardless of the severity of Williams' injuries, Petitioner did not intend to permanently and seriously disfigure her and that his actions were justified.[7]   To this end, counsel exposed the reality that

---

[7]
    Trial counsel's defense strategy is evident from his summation, in which he stated to the jury: "[y]ou heard testimony from a nurse and from a physician's assistant that Miss Williams has suffered nerve damage and that she suffered pain.   I don't think there is any question but that is accurate.   I'm not disputing that on behalf of my client, but as you may remember, the first count of the indictment, which charges assault in the first degree, alleges that

Petitioner and Williams had fought in the past and that these fights frequently turned physical. Counsel also emphasized that, when Petitioner engaged Williams in physical conflict, she did not shy away from him and had even bitten Petitioner in the past. T.T. 444-446. He also reminded the jury that Williams had pushed Petitioner first, and, after Petitioner bit her lip, Williams had chased him down the street and threw a brick at him. Additionally, the record reflects that counsel cross-examined Williams at length concerning her own criminal history, her tendency to react in a volatile manner, and the fact that she had not told the police the whole story when they arrived at the scene. T.T. 336. Thus, given his defense strategy of choosing not to focus on the permanent nature of Williams' injuries but rather on Petitioner's intent, it was reasonable for trial counsel to leave unchallenged the testimony of the prosecution's medical witnesses with respect to the extent and severity of Williams' injuries.

Moreover, trial counsel's decision not to specifically challenge the credentials of the prosecution's medical witnesses was also reasonable in that their respective credentials were unassailable. All three of the medical witnesses -- P.A. Chauncey and Nurses Vollmer and Collard -- were credentialed in the field of

---

[Petitioner's] intent was to disfigure another seriously and permanently, not to cause pain, not to cause nerve damage, but to seriously disfigure. And the judge is going to tell you when he instructs you that one of the elements that you need to find beyond a reasonable doubt was that [Petitioner] had an intent to seriously and permanently disfigure, not that he had an intent to cause pain or cause nerve damage, but that his intent, that what he wanted to accomplish was serious and permanent disfigurement." T.T. 540-541.

medicine, and based their respective opinions on their personal observations of the injuries sustained to Williams' upper lip made in the course of either treating her (P.A. Chauncey and Nurse Vollmer) or meeting with her after the incident to document the injuries (Nurse Collard).   T.T. 480-493.   Additionally, with respect to Nurse Collard, it is clear from the context of her overall testimony as well as her specific testimony that she only photographed Williams' injury, that she was not offering an authoritative medical opinion with respect to the severity of the injury when she stated that she had never seen a bite mark "as severe as [Williams']."  T.T. 481.  Rather, this statement was made as a fleeting comment at the close of her testimony in response to the prosecutor's pointed question, "have you ever a treated a client like Miss Williams with this type of injury, with someone literally missing a piece of their mouth?"  T.T. 481.

Finally, trial counsel's strategy was also reasonable given the need to contend with the <u>Molineux</u> evidence of Petitioner's prior bad acts, namely that Petitioner had engaged Williams twice before in physical altercations in which he had bitten her.  T.T. 373-375.  During his cross-examination of Williams, counsel attempted to portray these previous incidents as consistent with the normal way in which Petitioner and Williams resolved their disputes.  The desired end of this strategy -- despite the fact it ultimately proved unsuccessful -- appears to have been to convince

the jury that, however despicable Petitioner's conduct in this particular instance, he did not intend to seriously and permanently disfigure her.

Accordingly, this claim is meritless.  The state court's adjudication of this claim did not contravene or unreasonably apply clearly established Supreme Court law.  The claim is therefore denied.

## V.   Conclusion

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. No. 1) is denied, and the petition is dismissed.  Because Petitioner has failed to make "a substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability.  See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000).  The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person.  Coppedge v. United States, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with

United States Court of Appeals for the Second Circuit in accordance
with the requirements of Rule 24 of the Federal Rules of Appellate
Procedure.

**IT IS SO ORDERED.**

                              S/Michael A. Telesca

                              _____
                              HONORABLE MICHAEL A. TELESCA
                              United States District Judge

DATED:     August 27, 2012
           Rochester, New York